**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PANTHERA RAIL CAR LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 13-679 |
| | ) | Judge Nora Barry Fischer |
| KASGRO RAIL CORPORATION, a | ) | |
| Pennsylvania corporation, KASGRO | ) | |
| LEASING, LLC, KR LOGISTICS, LLC, and | ) | |
| KASGRO RAIL CAR MANAGEMENT, | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

This action arises out of allegedly improper rail car leasing arrangements involving Plaintiff Panthera Rail Car LLC ("Panthera") and Defendants Kasgro Rail Corporation, Kasgro Leasing, LLC, Kasgro Rail Car Management ("KRCM"), and KR Logistics, LLC ("KRL"). Plaintiff originally brought this lawsuit in the United States District Court for the Northern District of California, advancing claims for breach of contract, breach of the implied covenant of good faith and fair dealing, intentional and negligent interference with prospective economic advantage, fraud, negligent misrepresentation, aiding and abetting fraud, and violating the California Unfair Competition Law ("UCL") against some or all Defendants. (Docket No. 30, at 20-28).

Defendants filed motions to dismiss on March 1, 2013, asserting lack of personal jurisdiction, improper forum, and the doctrine of *forum non conveniens*. (Docket Nos. 37; 38; 40). In addition, KRL filed a substantive motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Docket No. 38, at 8). On May 13, 2013, Judge Susan Illston sitting in the Northern District of California transferred the case to the Western District of

Pennsylvania after finding that personal jurisdiction over Defendants was lacking. (Docket No. 52). Notwithstanding the transfer, KRL's motion to dismiss did not terminate. (Docket No. 85). Both Panthera and KRL filed supplemental briefs. (Docket Nos. 90; 91). During oral argument on the motion to dismiss, the Court granted Defendant KRL's Motion and ordered that Panthera submit a Second Amended Complaint. (Docket No. 98). The Court now writes separately to elaborate on its ruling and to provide guidance on the controlling substantive law in this case as to the claims asserted against KRL.

## I.      Federal Rule of Civil Procedure 12(b)(6) Standard

A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure challenges the legal sufficiency of a complaint. To survive a motion to dismiss, a complaint must contain sufficient factual pleadings to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *accord Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (citing *Twombly*). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court's plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679; *accord Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009) (quoting *Iqbal*). This requirement is designed to facilitate the federal notice-pleading standard, which requires "a short and plain statement of [a] claim *showing* that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2) (emphasis added). With respect to allegations of fraud, "a party must state with particularity the circumstances constituting fraud." FED. R. CIV. P. 9(b).

When ruling on a Rule 12(b)(6) motion, a court must accept as true all well-pleaded facts

and allegations and must draw all reasonable inferences therefrom in favor of the plaintiff. *See Iqbal*, 556 U.S. at 678; *see also Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010) (explaining that the ultimate determination in a Rule 12(b)(6) analysis is "whether plaintiff may be entitled to relief under any reasonable reading of the complaint"). The Court may consider "only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." *Lum v. Bank of Am.,* 361 F.3d 217, 222 n.3 (3d Cir. 2004). Nevertheless, a court need not credit bald assertions, unwarranted inference, or legal conclusions cast in the form of factual averments. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 n.8 (3d Cir. 1997). The plaintiff's obligation to provide the grounds of his legal entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). By authorizing dismissal on the basis of some dispositive issue of law, Rule 12(b)(6) dispenses with "needless discovery and factfinding" for the ultimate purpose of streamlining litigation. *Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989).

## II.    Plaintiff's Allegations

### A.  The Parties

Panthera is a Delaware LLC based in San Francisco, California. (Docket No. 30, at ¶ 1). Kasgro Rail Corporation and Kasgro Leasing, LLC are Pennsylvania corporate entities headquartered in New Castle, Pennsylvania. *Id.* at ¶ 2-3. The Kasgro Rail Corporation is a manufacturer of rail cars, while Kasgro Leasing, LLC is a leasing company. *Id.* at ¶ 31. KRCM was incorporated and operates in Indiana.[1] Finally, KRL is a Wisconsin LLC and subsidiary of Kasgro Rail Corporation, with its principal place of business in Milwaukee, Wisconsin. *Id.* at ¶

---

[1] Panthera's Amended Complaint does not provide information as to KRCM's state of incorporation or its principal place of business, but a quick internet search reveals its Indiana origins. Such information should be included in any subsequent pleading.

4. It is alleged that Kasgro Leasing, KRCM, and KRL are subsidiaries of Kasgro Rail Corporation. *Id.* at ¶¶ 3-5.

Upon the formation of KRL, John Silseth became its registered agent for service of process purposes and serves as one of its members. (Docket No. 30, at ¶¶ 4, 77). Mr. Silseth is also the President of Antietam LLC, which is the owner of Kasgro Rail Corporation, as well as the Treasurer and a Director of Kasgro Rail Corporation. *Id.* at ¶ 77. In addition, a number of other corporate officers for KRL serve as corporate officers for Kasgro Leasing, LLC, including Joseph F. Crawford, Jr., Jeffrey A. Plut, Predrag Stojanovic, Brian A. Blevins, David C. Boerke, Kenneth J. Heydon, and David V. Uihlein, Jr. *Id.* at ¶¶ 3-4.

## B. Background Facts on the Heavy Rail Car Industry

Between the years 1998-2002, Kasgro Rail Corporation built several hundred heavy duty rail cars, primarily for other owners/lessors. *Id.* at ¶ 32. During this time, Kasgro Rail Corporation and Kasgro Leasing, LLC (collectively, the "Kasgro Entities") entered into a series of ten-year identical leases with owners and lessors of heavy duty rail cars wherein the Kasgro Entities, in turn, acted as lessees and sublessors of the cars, renting them out to end users as an active operator. *Id.* at ¶ 33. The Kasgro Entities leased substantially all of the approximately 300 heavy duty rail cars they operated pursuant to a 1997 Lease with CLC Equipment Company ("CLC") and approximately fourteen other lessors. *Id.* at ¶¶ 41, 43; (Docket No. 30-1). The 1997 Lease was amended by the 2003 Lease Agreement, which was signed by CLC and the Kasgro Entities. (Docket No. 30, at ¶ 48; Docket No. 30-2).

By 2005, however, market demand for these rail cars did not meet expectations, and the Kasgro Entities had to ask their lessor group for a large scale, across the board rent reduction on

the heavy duty rail cars under lease to them.[2] (Docket No. 30, at ¶ 34). Pursuant to the 2005 Amendment and the resulting 2005 Revised Lease, the lessor group agreed to globally permit rent reductions of over 60%, which was conditioned on specific restrictions against the Kasgro Entities' ability to purchase or lease additional heavy duty rail cars.[3] *Id.* at ¶¶ 34-35; (Docket No. 30-3, at 9). In addition, the lessors secured other important rights through the 2005 Amendment, such as: (a) a $400,000 cap on the Kasgro Entities' annual capital expenditures between 2005 and 2013, effectively preventing them from becoming purchasers of heavy duty rail cars; (b) a profit sharing arrangement based on a percentage of the Kasgro Entities' profits; (c) a limitation of management fees to Antietam, LLC,[4] the Kasgro Entities' owner; and (d) a liquidated damages provision that would be triggered upon a breach of the 2005 Amendment and the 2005 Revised Lease.[5] (Docket No. 30, at ¶¶ 35, 49-56).

There are only approximately 2,200 active heavy duty rail cars in the United States today, with no plans to build any additional heavy duty rail cars in the future. *Id.* at ¶¶ 14, 28, 37. Virtually no heavy duty rail cars have been built since 2002, and a number have been scrapped. *Id.* at 37.

### C. Panthera's Entry into the Heavy Rail Car Industry

Panthera is a private investment firm that focuses primarily on investment in large cost equipment known to have a long economic life. *Id.* at ¶ 12. Sensing an opportunity to enter the heavy duty rail car leasing industry, Panthera purchased a fleet of twenty-two heavy duty rail

---

[2] Indeed, the Kasgro Entities were financially troubled and facing bankruptcy at this time. (Docket No. 30, at ¶¶ 34, 50; Docket No. 30-3, at 2).

[3] Section 5.2 of the 2005 Revised Lease stipulates: "No Other Leases. During the Revised Lease Term, neither Kasgro Entity shall enter into any new lease or other agreement pursuant to which it leases (as lessor or lessee) or acquires any Heavy-Duty Railcar, without the prior written approval of the Lessor." (Docket No. 30, at ¶ 53; Docket No. 30-3, at 9).

[4] Although not specifically pled in the Amended Complaint, based on the Court's research, Antietam, LLC is a private investment firm located in Milwaukee, Wisconsin.

[5] The 2005 Revised Lease will expire on December 31, 2013. (Docket No. 30, at ¶ 36).

cars that were under an existing lease to the Kasgro Entities in September 2011.[6] *Id.* at ¶¶ 16, 57. Panthera hoped that its purchase, plus its plans to acquire an additional 150 to 200 heavy duty rail cars, would give it additional leverage and bargaining power in the lease renewal negotiations with the Kasgro Entities. *Id.* at ¶ 22.

The Kasgro Entities provided Panthera with a written acknowledgement on August 31, 2011, recognizing Panthera as the new lessor and owner of the twenty-two rail cars ("Kasgro Acknowledgement"). *Id.* at ¶¶ 18, 58; (Docket No. 30-4). Pursuant to the Kasgro Acknowledgement, the Kasgro Entities represented that all rents going forward would be paid to Panthera and that no defaults or breaches of any representations, warranties, or covenants under the 2005 Revised Lease had occurred or were continuing to occur. (Docket No. 30, at ¶¶ 18, 59). Accordingly, Panthera believed that the Kasgro Entities were not a major owner of heavy duty rail cars and that they had not acquired or leased any new rail cars since 2005. *Id.* at ¶¶ 60-61.

### D. The Kasgro Entities Initiate Transactions Involving Heavy Duty Rail Cars

Despite the assurances of the Kasgro Entities, Panthera alleges that they had in fact taken steps to lease and acquire new heavy duty rail cars during the time period in which the 2005 Revised Lease and the 2005 Amendment were operative. Specifically, in or about 2010, the Kasgro Entities had leased, with an option to buy at lease end, over sixty heavy duty rail cars from Maxus Leasing Group, Inc. *Id.* at ¶¶ 67-69. Panthera also discovered that the Kasgro Entities claimed ownership over an additional five heavy rail cars that they had purchased from MBC Leasing Corporation sometime after the year 2008. *Id.* at ¶¶ 70-73.

In addition, Panthera learned that the Kasgro Entities had leased four heavy duty rail cars on March 30, 2011 to the Westinghouse Electric Company, LLC ("Westinghouse") for sixty

---

[6] The Purchase and Sale Agreement was executed with Railroad Technology Corporation, a successor in interest to CLC, the original lessor of the cars. (Docket No. 30, at ¶ 16).

months at a rental rate of $12,000 per month through KRCM ("Westinghouse Lease"). *Id.* at ¶¶ 74-76; (Docket No. 30-6, at 28-33). The Westinghouse Lease would later be assigned to KRL, which would not be formed as a company until November 2011. (Docket No. 30, at ¶ 77; Docket No. 30-6, at 27). A "Security Agreement" between InvestorsBank and KRL dated December 13, 2011 indicated that InvestorsBank financed KRL's purchase of the rail cars and rail car leases involved in the Westinghouse Lease for $1.41 million. (Docket No. 30, at ¶ 78; Docket No. 30-6, at 7). None of the proceeds from these transactions went to the Kasgro Entities or were otherwise made available to their lessors, including Panthera, in violation of the 2005 Revised Lease agreement. (Docket No. 30, at ¶ 79). Panthera further asserts that the Kasgro Entities, through KRL, leased another thirteen heavy duty rail cars to Westinghouse without observing the profit sharing provisions of the 2005 Revised Lease. *Id.* at ¶ 82.

In the fall of 2011, prior to discovering that the Kasgro Entities had allegedly violated the 2005 Revised Lease and the 2005 Amendment, Panthera advised Joseph Crawford, Kasgro's President and CEO, as well as Jeff Plut, the CFO, about its plan to purchase additional heavy duty rail cars from other lessors. *Id.* at ¶ 64. During this discussion, neither Mr. Crawford nor Mr. Plut mentioned that the Kasgro Entities had already purchased and/or leased numerous heavy duty rail cars from the very same lessor group. *Id.* at ¶ 65. Instead, Mr. Crawford and Mr. Plut informed Panthera that the Kasgro Entities were planning to conduct a market study to determine their interest level in additional rail cars and/or lease negotiations upon expiration of the 2005 Revised Lease on December 31, 2013. *Id.* at ¶ 64. By December 2011, however, the Kasgro Entities had secured financing for an additional sixteen heavy duty rail cars owned by Signature Funding and Maxus. *Id.* at ¶¶ 89-90.

In February 2012, Panthera's principals and co-founders Paul Weiss and Sean Hoel

engaged in negotiations with Dan Wallace, Senior Vice President of Structured Finance at General Electric ("GE"), regarding the purchase of 94 GE heavy duty rail cars for $13.7 million. *Id.* at ¶ 91. These negotiations were disclosed to the Kasgro Entities through Mr. Crawford and Mr. Plut. *Id.* at ¶ 92. At that time, Mr. Plut responded that "those cars were promised to us by GE last year," to which Panthera executives pointed out that such a purchase would be contrary to the 2005 Revised Lease. *Id.* at ¶ 93. However, when Panthera advised GE that it was ready to proceed with the purchase, Mr. Wallace responded that he was "trying to get an update from Kasgro" in an email dated July 16, 2012. *Id.* at ¶ 95. Upon further inquiry, Mr. Wallace confirmed that the Kasgro Entities were in direct discussions with GE to acquire the same heavy duty rail cars that Panthera was attempting to purchase. *Id.* at ¶ 96. He informed Panthera that Mr. Crawford would be flying to Chicago to discuss the terms of the deal with GE. *Id.* Although Panthera protested that the Kasgro Entities were prohibited from purchasing any heavy duty rail cars without its consent, GE opted to sell the cars to the Kasgro Entities. *Id.* at ¶¶ 97-100.

In light of these developments, Panthera sent a Notice of Default dated August 10, 2012 pursuant to the 2005 Revised Lease to the Kasgro Entities. *Id.* at ¶ 102. Four days later, the Kasgro Entities responded that they were not purchasing leased cars from GE. *Id.* at ¶¶ 103-04. Panthera later learned that in September 2012, the Laurel Capital Corporation had obtained financing to purchase the GE rail cars on the basis of a future lease of the GE cars to Kasgro Leasing commencing on January 1, 2014 and ending in 2019. *Id.* at ¶ 105. At the end of the lease term, the Laurel Capital Corporation is required to sell the cars to the Kasgro Entities at a fixed price. *Id.*

After sending a notification and demand for payment of liquidated damages in the amount of $4,078,000 as well as a request for financial information to the Kasgro Entities, *id.* at

¶¶ 109-10, Panthera filed suit. (Docket No. 1). As to KRL, Panthera has asserted claims for fraud, aiding and abetting fraud, as well as unfair competition pursuant to the California UCL. (Docket No. 30, at ¶¶ 146-157, 162-174).

## III. Discussion

Based on the allegations contained in the Amended Complaint, Panthera asserts three claims against KRL, either directly or as an alter ego for the other Defendants: (1) fraud; (2) aiding and abetting fraud; and (3) engaging in unfair competition in violation of California law. (Docket No. 30, at ¶¶ 146-157, 162-174). Defendant KRL seeks to dismiss all of these claims against it pursuant to Rule 12(b)(6) for insufficiently pleading the causes of action as well as for failure to sufficiently establish that it is liable for any of the alleged wrongdoing of the other Defendants on an alter ego theory. (Docket No. 38, at 8-19). The parties have briefed the potential applicability of California, Pennsylvania, Minnesota, and Wisconsin's substantive laws as to these claims.[7] (Docket No. 90; Docket No. 91). Accordingly, the Court must first undertake a choice of law analysis to determine which state's law applies to these claims before delving into an analysis of the sufficiency of the pleadings.

---

[7] The Court notes that Panthera and the Kasgro Entities have agreed to a number of choice of law provisions, as contained in the 2005 Revised Lease, (Docket No. 30-1, at 32), and in the Kasgro Acknowledgement. (Docket No. 30-4, at 3). The Third Circuit Court of Appeals has recognized that "Pennsylvania courts will uphold choice-of-law provisions in contracts to the extent that the transaction bears a reasonable relation to the chosen forum." *Gay v. CreditInform*, 511 F.3d 369, 390 (3d Cir. 2007) (quoting *Churchill Corp. v. Third Century, Inc.*, 578 A.2d 532, 537 (1990)). For different reasons, however, both KRL and Panthera agree that the choice of law provisions in the 2005 Revised Lease are not applicable to their dispute. (Docket No. 90, at 6; Docket No. 91, at 8-9). KRL contends that it was never a party to the 2005 Revised Lease agreement and therefore should not be bound by any of its provisions. (Docket No. 90, at 6). On the other hand, Panthera points out that the claims against KRL sound in tort and contractual choice of law provisions do not govern those tort claims. *See Stillwagon v. Innsbrook Golf & Marina, LLC*, Civ. No. 11-1338, 2013 WL 1180312, at *6 n.10 (W.D. Pa. Mar. 20, 2013) (Hornak, J.) ("Contractual choice of law provisions ... do not govern tort claims between contracting parties unless the fair import of the provision embraces all aspects of the legal relationship.") (quoting *Jiffy Lube Int'l v. Jify Lube of Pa., Inc.*, 848 F. Supp. 569 (E.D. Pa. 1994)). Accordingly, the Court will disregard these contractual choice of law provisions. Because Minnesota and New York's connection, if any, to this tort dispute between Panthera and KRL arises from these choice of law clauses, the Court will limit its discussion only to the potential applicability of California, Pennsylvania, and Wisconsin law.

### A. Choice of Law Analysis

It has long been established that a federal court sitting in diversity must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941); *see also Pac. Emp'rs Ins. Co. v. Global Reinsurance Corp. of Am.*, 693 F.3d 417, 432 (3d Cir. 2012) ("As a federal court sitting in diversity, we apply the choice-of-law rules of the forum state, which is Pennsylvania in this case.") (citing *Klaxon*). In the event of a transfer from one federal district court to another, however, the applicable choice of law rules depends on the nature of the transfer. Where a case is transferred from one federal court district to another pursuant to 28 U.S.C. § 1404(a) "[f]or the convenience of the parties," the transferee court must apply the choice of law rules of the transferor court. *Ferens v. John Deere Co.*, 494 U.S. 516, 530-31 (1990); *see also Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964) ("A change of venue under § 1404(a) generally should be, with respect to state law, but a change of courtrooms."); *Arnica Mut. Life Ins. Co. v. Fogel*, 656 F.3d 167, 171 (3d Cir. 2011) (same) (summarizing the holding in *Ferens*). By contrast, the transferee court applies the choice of law rules applicable in the forum state for a transfer ordered pursuant to 28 U.S.C. § 1406(a) for improper venue or § 1631 for lack of jurisdiction. *Lafferty v. St. Rial*, 495 F.3d 72, 77 (3d Cir. 2007) (citations omitted). The choice of law rules of the transferor state do not apply because the court sitting in that state was never a proper forum in the first instance. *Gerena v. Korb*, 617 F.3d 197, 204 (2d Cir. 2010).

Here, Judge Illston transferred this case pursuant to § 1406(a) because there was no personal jurisdiction over Defendants in the Northern District of California. (Docket No. 52, at 9). Because this transfer was effectuated to cure a jurisdictional defect, the Court therefore applies Pennsylvania's choice of law rules.

### 1. Theory of Alter Ego Liability

Before the Court turns to the choice of law rules as they pertain to the tort causes of action, the Court will first address the theory of alter ego liability as it permeates the allegations of the Amended Complaint. Pursuant to the "internal affairs doctrine," courts are to look to the law of the state of incorporation to resolve issues involving the internal affairs of a corporation. *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 179 n.10 (3d Cir. 2005) (citing *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89-93 (1987) and *First Nat'l City Bank v. Banco Para El Comercio*, 462 U.S. 611, 621 (1983)); *Stillwagon v. Innsbrook Golf & Marina, LLC*, Civ. No. 11-1338, 2013 WL 1180312, at *7 (W.D. Pa. Mar. 20, 2013) (Hornak, J.) (citing *Banjo Buddies*). Pennsylvania has adopted the internal affairs doctrine by statute. *See* 15 PA. CONST. STAT. § 4145(a) ("the court having jurisdiction of the action or proceeding shall apply the law of the jurisdiction under which the foreign domiciliary corporation was incorporated"); *see also In re Estate of Hall*, 731 A.2d 617, 622 (Pa. Super. Ct. 1999) (applying 15 PA. CONST. STAT. § 4145(a)). Therefore, "[u]nder Pennsylvania's choice of law rules, '[t]he existence and extent of the liability of a shareholder for … payments of debts of the corporation, is determined by the law of the state of incorporation.'" *In re Sch. Asbestos Litig.*, Civ. No. 83-0268, 1993 WL 209719, at *3 (E.D. Pa. June 15, 1993) (quoting *Broderick v. Stephano*, 171 A. 582, 583 (Pa. 1934)).

Because piercing of corporate veil theories essentially seek to hold shareholders responsible for the liabilities of their corporations, courts use the corporate law of the targeted entity's state of incorporation. *See In re Sch. Asbestos Litig.*, 1993 WL 209719, at *3 (New Jersey law applied for alter ego claim against New Jersey corporation pursuant to Pennsylvania choice of law rules). KRL was incorporated in the state of Wisconsin. (Docket No. 30, at ¶ 4). In

light of Pennsylvania's internal affairs doctrine, the Court applies Wisconsin's corporate law to evaluate Panthera's alter ego theory.

### 2. Pennsylvania's Hybrid Choice of Law Approach

Where corporate law is not implicated, Pennsylvania uses a "hybrid" choice of law approach that combines the "governmental interest analysis" with the Second Restatement of Conflict's "most significant relationship" test. *Carrick v. Zurich-American Ins. Grp.*, 14 F.3d 907, 909 (3d Cir. 1994) (quoting *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 187 (3d Cir. 1991)); *see also Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir. 2007) (citations omitted); *Reginella Constr. Co., Ltd. v. Travelers Cas. and Sur. Co. of Am.*, __ F. Supp. 2d ___, 2013 WL 2404140, at *8 (W.D. Pa. May 31, 2013). This approach requires the Court to first determine whether there is a relevant difference between the law of the jurisdictions whose laws potentially apply, i.e., whether there is a conflict. *Hammersmith*, 480 F.3d at 230. If the laws of the jurisdictions are the same, "then there is no *conflict* at all, and a choice of law analysis is unnecessary." *Id.* (emphasis in original). In the absence of a conflict, "the district court sitting in diversity may refer interchangeably to the laws of the states whose laws potentially apply." *Huber v. Taylor,* 469 F.3d 67, 74 (3d Cir. 2006) (citing *On Air Entm't Corp. v. Nat'l Indem. Co.*, 210 F.3d 146, 149 (3d Cir. 2000)).

If the laws differ, the Court must examine the interests and policies underlying the law of each jurisdiction and determine whether the conflict is "true," "false," or "unprovided for." *Hammersmith*, 480 F.3d at 230-32. A false conflict exists only if one jurisdiction's governmental interests would be impaired by the application of another jurisdiction's law. *Budget Rent-A-Car v. Chappell*, 407 F.3d 166, 170 (3d Cir. 2005). When there is a false conflict, the Court must apply the law of the only interested jurisdiction. *Id*. If no jurisdiction's interest would be

impaired if its laws were not applied, there is an "unprovided for" conflict and *lex loci delicti* (the law of the place of the wrong) continues to govern. *Budget Rent-A-Car Sys.*, 407 F.3d at 170 (citing *Miller v. Gay*, 470 A.2d 1353 (Pa. 1983)).

In contrast, "a 'deeper [choice of law] analysis' is necessary only if *both* jurisdictions' interests would be impaired by the application of the other's laws (i.e., there is a true conflict)." *Hammersmith*, 480 F.3d at 230 (alterations in original); *see also Budget Rent-A-Car Sys.*, 407 F.3d at 170 ("A true conflict exists 'when the governmental interests of [multiple] jurisdictions would be impaired if their law were not applied.'") (quoting *Lacey*, 932 F.2d at 187 & n. 15). If a true conflict exists, the Court must "'determine which state has the greater interest in the application of its law.'" *Pacific Employers Ins. Co. v. Global Reinsurance Corp. of Am.*, 693 F.3d 417, 436 (3d Cir. 2012) (quoting *Hammersmith*, 480 F.3d at 231). To this end, the Court must weigh each state's contacts on a qualitative scale according to their relation to the policies and interests underlying the particular issue. *Hammersmith*, 480 F.3d at 231 (citing *Shields v. Consol. Rail Corp.*, 810 F.2d 397, 400 (3d Cir. 1987)).

### 3. Classifying the Conflict

The Third Circuit Court of Appeals has held that Pennsylvania choice of law analysis "employs depecage,[8] the principle whereby 'different states' laws may apply to different issues in a single case." *Taylor v. Mooney Aircraft Corp.*, 265 F. App'x 87, 91 (3d Cir. 2008) (citing *Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 462 (3d Cir. 2006)). Therefore, the Court must separately analyze the law of the potentially interested jurisdictions (i.e., California, Pennsylvania, and Wisconsin) regarding each of the disputed legal issues—fraud, aiding and abetting fraud, unfair competition, and alter ego liability. The following discussion will set forth

---

[8] "A French word, depecage (DE-PA-SAJ) is defined as a 'cutting up, dismembering, carving up.'" *Taylor v. Mooney Aircraft Corp.*, 265 F. App'x 87, 92, n.5 (3d Cir. 2008) (quoting *Kelly v. Ford Motor Co.*, 942 F. Supp. 1044, 1045 n.2 (E.D.Pa.1996) (citation omitted)).

the Court's reasoning for applying California law as to the fraud, aiding and abetting fraud, and unfair competition claims.

### a) Common Law Fraud

As to the fraud claim, Panthera argues that the potentially involved states' laws differ in that: (1) they have different economic loss doctrines; and (2) some of the states have gist of the action doctrines whereas others do not. *Id.* at 12-13 & n.8. Specifically, Panthera points out that Wisconsin, and Pennsylvania have broader economic loss doctrines than California. *Id.* For example, Pennsylvania's economic loss doctrine "precludes recovery in tort if the plaintiff suffers a loss that is exclusively economic, unaccompanied by an injury to either property or person." *Bouriez v. Carnegie Mellon Univ.*, 430 F. App'x 182, 187 (3d Cir. 2011); *see also Stillwagon*, 2013 WL 1180312, at *9 (citation omitted). Under California law, however, "a plaintiff can recover for loss of expected economic advantage through the negligent performance of a contract although the parties were not in contractual privity" if there is a "special relationship"[9] between the parties. *J'Aire v. Gregory*, 24 Cal. 3d 799, 804 (1979). Similarly, Panthera argues that Pennsylvania courts apply the gist of the action doctrine,[10] whereas California and Wisconsin do not recognize this concept. (Docket No. 91, at 13 n.8).

---

[9] A "special relationship" under California law exists where (1) the plaintiff was an intended beneficiary of the defendant's obligations under a contract; (2) the plaintiff's loss was foreseeable; (3) there is a high degree of certainty that the plaintiff would suffer the loss from the defendant's conduct; (4) there is a close connection between the defendant's conduct and the plaintiff's loss; (5) the defendant's conduct is morally blameworthy; and (6) public policy favors holding the defendant responsible for plaintiff's economic loss. *J'Aire v. Gregory*, 24 Cal. 3d 799, 804 (1979); *Biakanja v. Irvine*, 320 P.2d 16, 19 (Cal. 1958). While there does appear to be at least one exception to the economic loss doctrine under Pennsylvania law for negligent misrepresentation, *see Bouriez*, 430 F. App'x at 188, it is not clear whether a similar exception for a "special relationship" exists.

[10] The gist of the action doctrine precludes tort claims "1) arising between the parties; 2) when the alleged duties breached were grounded in the contract itself; 3) where any liability stems from the contract; and 4) when the tort claim essentially duplicates the breach of contract claim or where the success of the tort claim is dependent on the success of the breach of contract claim." *Reardon v. Allegheny Coll.*, 926 A.2d 477, 486 (Pa. Super. Ct. 2007). The Pennsylvania Supreme Court has never adopted the gist of the action doctrine, but the Third Circuit Court of Appeals predicted that this doctrine would be adopted based on its consistent application in the Pennsylvania Superior Court. *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 103 n.10 (3d Cir. 2001) (citations omitted).

Here, neither the economic loss nor the gist of the action doctrine applies. Both doctrines only operate to strike tort claims that either should have been litigated as contract claims or are accompanied by parallel contract claims based on the same underlying facts. *See Sunshine v. Reassure Am. Life Ins. Co.*, Civ. No. 12-1796, 2013 WL 586775, at *3 (3d Cir. Feb. 15, 2013) ("The purpose of the [economic loss] doctrine is to 'prevent[ ] tort law from reallocating risks between parties who have fairly negotiated an arms-length contract.'") (quoting *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 679 (3d Cir. 2002)); *eToll, Inc. v. Elias/Savion Advertising, Inc.*, 811 A.2d 10, 14 (Pa. Super. Ct. 2002) (the gist of the action doctrine "is designed to maintain the conceptual distinction between breach of contract claims and tort claims").

Panthera's fraud claim against KRL, however, essentially sounds in tort. Indeed, the Amended Complaint reveals no contract, much less direct contact, between Panthera and KRL at any relevant time. KRL has consistently asserted, without challenge, that there is no contractual relationship with Panthera in its briefing, (Docket No. 90, at 6), as well as at the motions hearing. (Docket No. 97, at 7, 12-13, 45). Although the Court is aware that Judge Illston had previously stated that "[b]ecause all of the tort claims arise out of the parties' contractual relationship, this case sounds primarily in contract," (Docket No. 52, at 6), her discussion was provided in the context of the personal jurisdiction analysis and does not govern this Court's choice of law analysis.[11] *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 481-82 (1985) ("choice-of-law analysis—which focuses on all the elements of a transaction, and not simply on the defendant's conduct—is distinct from minimum-contacts jurisdictional analysis—which focuses on the threshold solely on the defendant's purposeful connection to the forum"). Accordingly,

---

[11] Whether the gist of the action or economic loss doctrines might apply in the context of the contract and tort claims advanced against the Kasgro Entities remains an open question that can be resolved in a later proceeding, in the event this matter does not resolve at mediation. *See* W.D. Pa. L.R. 16.2; COURT'S ADR POLICIES AND PROCEDURES, www.pawd.uscourts.gov (last visited August 21, 2013).

Pennsylvania law would not bar Panthera's fraud claim.

As the parties agree the substantive fraud laws of all the states are the same in all other respects, (Docket No. 90, at 7 & n.2; Docket No. 91, at 16), there is no conflict and the Court can apply the fraud laws of California, Pennsylvania, and Wisconsin interchangeably. *See Huber,* 469 F.3d at 74.

### b) Common Law Aiding and Abetting Fraud

Recent developments indicate that Pennsylvania law now recognizes a civil claim for aiding and abetting fraud.[12] Pursuant to the Second Restatement of Torts, a defendant is subject to liability for the tortious action of another in three circumstances:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
> (a) does a tortious act in concert with the other or pursuant to a common design with him, or
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

RESTATEMENT (SECOND) OF TORTS § 876. Beginning with the Pennsylvania Supreme Court's decision endorsing § 876(a) of the Second Restatement's "concert of action" theory in *Skipworth by Williams v. Lead Indus. Ass'n, Inc.*, 690 A.2d 169, 174 (Pa. 1997), Pennsylvania courts have begun to accept claims for giving substantial assistance or encouragement to another tortfeasor under § 876(b) as well. *See, e.g.*, *Sovereign Bank v. Valentino*, 914 A.2d 415, 422-24 (Pa. Super. Ct. 2006); *Koken v. Steinberg*, 825 A.2d 723, 731-32 (Pa. Commw. Ct. 2003). A number of federal courts have similarly recognized that such aiding and abetting tortious conduct claims

---

[12] The Court is aware, however, the Pennsylvania has long recognized that a criminal defendant can be guilty of being an accessory to a felony such as fraud by aiding or abetting in the perpetration of said felony. *See Commonwealth v. Flowers*, 387 A.2d 1268, 1270 (Pa. 1978) (citations omitted).

would be viable under Pennsylvania law. *See In re Le-Nature's Inc., v. Wachovia Capital Markets, LLC*, Civ. No. 09-mc-162, 2009 WL 3571331, at *15 (W.D. Pa. Sept. 16, 2009) (Ambrose, C.J.); *Gilliland v. Hergert*, Civ. No. 05-1059, 2007 WL 4105223, at *7-8 (W.D. Pa. Nov. 15, 2007) (McVerry, J.); *Chicago Title Ins. Co. v. Lexington & Concord Search and Abstract, LLC*, 513 F. Supp. 2d 304, 318 (E.D. Pa. 2007) (citing *Koken*, 825 A.2d at 732).

In the absence of a controlling opinion from a state's highest court on an issue of state law, federal courts must predict how that court would decide the issue. *Pacific Employers Ins. Co.*, 693 F.3d at 433 (citing *Nationwide Mut. Ins. Co. v. Buffetta*, 230 F.3d 634, 637 (3d Cir.2000)). When predicting state law, due regard can be given to the decisions of lower state courts. *Id.* (citing *Nationwide*). On the other hand, the opinions of intermediate appellate state courts are not to be disregarded unless there is persuasive data that the highest court of the state would decide otherwise. *Id.* (citing *Nationwide*).

This Court predicts that the Pennsylvania Supreme Court would recognize a cause of action for aiding and abetting the tortious conduct of another in accordance with § 876(b) of the Second Restatement of Torts. In so holding, the Court's ruling is in agreement with the prior decisions, *In re Le-Nature's* and *Gilliland*, which were rendered by other courts in this District.

Further, the Court finds the decisions cited by KRL[13] to be unpersuasive. It is duly noted that following the *Skipworth* decision, a few federal courts continue to refuse to recognize aiding and abetting fraud as a valid cause of action under Pennsylvania law. *See Amato v. KPMG LLP*, 433 F. Supp. 2d 460, 473-74 (M.D. Pa. 2006), *vacated upon reconsideration on other grounds by* 2006 WL 2376245 (M.D. Pa. Aug. 14, 2006); *WM High Yield Fund v. O'Hanlon*, Civ. No. 04-3423, 2005 WL 6788446, at *15 (E.D. Pa. May 13, 2005) (collecting cases). In this Court's

---

[13] The Court notes that KRL's brief fails to reference *Skipworth*, and a number of the cases it has cited actually predate that Pennsylvania Supreme Court decision. (Docket No. 90, at 8).

estimation, however, these decisions do not seem to fully appreciate *Skipworth*'s import. While the *Amato* and *WM High Yield Fund* decisions did reference *Skipworth* in the context of civil conspiracy, there was no discussion about *Skipworth*'s holding as to § 876 of the Second Restatement of Torts. *See Amato*, 433 F. Supp. 2d at 475; *WM High Yield Fund*, 2005 WL 6788446, at *14. Furthermore, the court in *WM High Yield Fund* relied entirely on citations to cases predating *Skipworth* when declaring that the "majority of other courts in this district" had held that "the Pennsylvania Supreme Court would not permit such an action." 2005 WL 6788446, at *15 (citing *Klein v. Boyd*, Civ. No. 95-5410, 1996 WL 675554, at *33 (E.D. Pa. Nov. 19, 1996) and *S. Kane & Son Profit Sharing Trust v. Marine Midland Bank*, Civ. No. 95-7058, 1996 WL 325894, at *9 (E.D. Pa. June 13, 1996)). Instead, the Court credits the more recent decisions citing *Skipworth* and its progeny as to the Pennsylvania Supreme Court's anticipated adoption of § 876(b) of the Second Restatement of Torts, as noted above. *See In re Le-Nature's*, 2009 WL 3571331, at *15 & n.16; *Gilliland*, 2007 WL 4105223, at *7-8; *Chicago Title Ins. Co.*, 513 F. Supp. 2d 304, 318.

The Court next finds that Pennsylvania, California, and Wisconsin law on aiding and abetting fraud are substantially identical. Like Pennsylvania, California courts have adopted § 876 of the Second Restatement of Torts. *See, e.g.*, *Casey v. U.S. Bank Nat'l Ass'n*, 26 Cal. Rptr. 3d 401, 405 (Cal. Ct. App. 2005) (citing RESTATEMENT (SECOND) OF TORTS § 876); *Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1118 (C.D. Cal. 2003) (citing RESTATEMENT (SECOND) OF TORTS § 876); *In re First Alliance Mortg. Co.*, 298 B.R. 652, 668 (Bankr. C.D. Cal. 2003) ("California law is consistent with Section 876(b) of the Restatement of Torts."), *aff'd by* 471 F.3d 977 (9th Cir. 2006). In addition, the Wisconsin Court of Appeals has recognized that "[t]he Restatement test [of § 876(b)] is not substantially different from Wisconsin's test for …

aiding and abetting" in the context of a tort claim. *Winslow v. Brown*, 371 N.W.2d 417, 422-23 (Wis. Ct. App. 1985); *see also Knox Enters., Inc. v. Jetzer*, 787 N.W.2d 266, at *5 (Wis. Ct. App. 2010) ("In Wisconsin, a person may be held civilly liable for aiding and abetting if he or she: (1) undertakes conduct that as a matter of objective fact aids another in the commission of an unlawful act; and (2) consciously desires or intends that his conduct will yield such assistance.") (citing *Edwardson v. Am. Family Mut. Ins. Co.*, 589 N.W.2d 436, 440 (Wis. Ct. App. 1998). Given that the laws of California, Pennsylvania, and Wisconsin regarding aiding and abetting fraud are all modeled after or identical to § 876(b) of the Second Restatement of Torts, the Court can apply these states' laws on this cause of action interchangeably.

### c) California's Unfair Competition Law

The California UCL prohibits "any unlawful, unfair or fraudulent business act or practice." CAL. BUS. & PROF. CODE § 17200. "The section was intentionally framed in its broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable 'new schemes which the fertility of man's invention would contrive.'" *Cel-Tech Commcns, Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527, 540 (Cal. 1999) (quoting *Am. Philatelic Soc'y v. Claibourne*, 46 P.2d 135, 139 (Cal. 1935)); *McDonald v. Coldwell Banker*, 543 F.3d 498, 506 (9th Cir. 2008) (explaining that an unfair business practice is one that "either offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers") (citing *People v. Casa Blanca Convalescent Homes, Inc.*, 206 Cal. Rptr. 164 (Cal. Ct. App. 1984)). Indeed, a federal court sitting in California observed that § 17200 "'borrows' violations of other laws and makes them independently actionable as unfair competitive business practices," such that "[v]irtually any law, federal, state or local, can serve as a predicate for an action under the UCL." *Lauter v. Anoufrieva,* 642 F. Supp. 2d 1060, 1096

(C.D. Cal. 2009) (citing *Troyk v. Farmers Group, Inc.*, 86 Cal. Rptr. 3d 416, 440-41 (2008)). Moreover, "a practice may be proscribed under section 17200 as 'unfair' even if it is not specifically proscribed by some other law." *Id.*; *Rubin v. Green*, 847 P.2d 1044, 1052 (Cal. 1993) (characterizing the UCL as "sweeping, embracing 'anything that can properly be called a business practice and that at the same time is forbidden by law'").

Panthera claims that a conflict exists because "neither … Wisconsin nor Pennsylvania has a statute similar to California's [UCL] statute."[14] (Docket No. 91, at 13 n.8) (citing CAL. BUS. & PROF. CODE § 17200, et seq.). KRL has not contested this assertion either in its brief or during oral argument. Rather, it defends on the basis that this statute has no extraterritorial application. (Docket No. 90, at 10). It specifically relies on the proposition that "[courts] presume the Legislature did not intend a statute to be 'operative, with respect to occurrences outside the state … unless such intention is clearly expressed or reasonably to be inferred from the language of the act or from its purpose, subject matter or history.'" *Sullivan v. Oracle Corp.*, 254 P.3d 237, 248 (Cal. 2011) (quoting *Diamond Multimedia Sys., Inc. v. Superior Court*, 968 P.2d 539, 553 (Cal. 1999)). However, Panthera has pointed out that the injury was felt in California, where it maintains its principal place of business, (Docket No. 91, at 14), thereby establishing a basis for

---

[14] The Court notes that both the Amended Complaint and Panthera's briefs accuse all Defendants of violating California's Unfair Business Practices statute, but reference only § 17200. (Docket No. 30, at 28; Docket No. 91, at 13 n.8). The California Unfair Business Practices statute, which is codified at § 17000 et seq., narrowly applies to "specific 'practices which the legislature has determined constitute unfair trade practices.'" *Cel-Tech Commcns, Inc.*, 973 P.2d at 539. On the other hand, the California Supreme Court has repeatedly reiterated that the scope of the UCL, which is codified at § 17200, et seq., as opposed to the Unfair Practices Act, is "sweeping, embracing 'anything that can properly be called a business practice and that at the same time is forbidden by law.'" *Rubin v. Green*, 847 P.2d 1044, 1052 (Cal. 1993); *see Cel-Tech Commcns, Inc.*, 973 P.2d at 539 ("Unlike the Unfair Practices Act, [the UCL] does not proscribe specific practices."). Given that Panthera cited to § 17200, it is probably suing for a violation of the California UCL rather than a violation of California's Unfair Practices Act. To the extent that Panthera seeks to invoke the Unfair Practices Act, any wrongdoing will probably also constitute a claim under the UCL in light of the latter statute's broad scope. This discrepancy should be addressed in the Second Amended Complaint.

the application of California law.[15] *See Churchill Vill., L.L.C. v. Gen. Elec. Co.*, 169 F. Supp. 2d 1119, 1126 (N.D. Cal. 2000) ("section 17200 does not support claims by non-California residents where none of the alleged misconduct or injuries occurred in California") (citing *Nw. Mortg., Inc. v. Superior Court*, 85 Cal. Rptr. 2d 18 (1999)).

Neither party has called the Court's attention to the existence of Pennsylvania or Wisconsin state law that is analogous to the California UCL to aid in the determination of whether these states' laws differ. Based on the Court's research, however, the most similar statutes appear to be Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 PA. CONS. STAT. § 201-3, and Wisconsin's statute prohibiting "[u]nfair methods of competition in business and unfair trade practices in business." WIS. STAT. § 100.20. Nevertheless, Panthera would be unable to pursue a claim under the PTPCPL because it did not "purchase[ ] or lease[ ] goods or services primarily for personal, family or household purposes." 73 PA. CONS. STAT. § 201-9.2(a). Likewise, Panthera could not to pursue a cause of action pursuant to Wisconsin's § 100.20(5) because it has not alleged that KRL violated an order issued by the Wisconsin Department of Agriculture, Trade, and Consumer Protection. *See Emergency One, Inc. v. Waterous Co., Inc.*, 23 F. Supp. 2d 959, 971-72 (E.D. Wis. 1998) ("no private cause of action exists under § 100.20(5), except for violation of an order issued by the Department under this section"); *Benkoski v. Flood*, 626 N.W.2d 851, 857 (Wis. Ct. App. 2001) (discussing purposes and policies underlying permitting limited private causes of action under § 100.20(5)). Thus, the states' laws apparently conflict.

---

[15] As to KRL's related suggestion that a defendant who is not subject to *in personam* jurisdiction in California is therefore not subject to California law, (Docket No. 90, at 11) (citing *Yu v. Signet Bank/Virginia*, 69 Ca. App. 4th 1377, 1391 (1999)), the Court has already explained that the choice of law analysis is conceptually distinct from issues involving personal jurisdiction. *See, e.g.*, *Burger King Corp.*, 471 U.S. at 481-82; *Shaffer v. Heitner*, 433 U.S. 186, 215 (1977) (a State's law can be applied to a dispute even though its courts lack jurisdiction over the parties); *Joseph Oat Holdings, Inc. v. RCM Digesters, Inc.*, 409 F. App'x 498, 505 (3d Cir. 2010) (applying California's UCL and reversing district court decision for failure to ascertain a genuine issue of material fact as to this statutory cause of action).

The Court next proceeds to ascertain whether the conflict is "true," "false," or "unprovided for." California's interest in protecting victims of unfair competition, broadly construed, is obviously implicated in this case because Panthera operates in California and sustained economic losses there. *See* Sharon J. Arkin, *The Effective Use of California's Unfair Competition Law to Redress Managed Care Abuses*, 22 WHITTIER L. REV. 467, 468 (2000) ("Indeed, the goal of the act is … intended to address the general societal harm that results when business enterprises act illegally or unethically."); Mathieu Blackston, Comment, *California's Unfair Competition Law—Making Sure the Avenger is not Guilty of the Greater Crime,* 41 SAN DIEGO L. REV. 1833, 1845-47 (2004) (the policy rationale of California's UCL is to protect the consuming public as well as businesses from unfair practices, which could otherwise lead to a "race to the bottom" problem). Even if Pennsylvania and Wisconsin law do not recognize a cause of action for unfair competition, this does not mean that those states lack an interest in the case. Instead, the lack of a similarly robust unfair competition law amounts to a policy choice not to provide an avenue of liability for independent violations of law or open-ended allegations of wrongful business practices.

As a result, there is a true conflict. The application of California law would impair the governmental interests of both Pennsylvania and Wisconsin, which opted to take a more defendant-friendly approach. Conversely, if either Pennsylvania or Wisconsin law applied, California's interest in the vindication of a California-based party's rights would be impaired.

### 4. Contacts and Interests Analysis

In the context of a tort claim, the relevant contacts to weigh are enumerated in § 145(2) of the Second Restatement of Conflict of Laws and include "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile,

residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Taylor*, 265 F. App'x at 91 n.4. Federal courts applying Pennsylvania choice of law rules have recognized that where the injury is pecuniary in nature, the plaintiff's principal place of business is generally considered the place of injury and represents a contact of substantial significance. *CAT Internet Servs., Inc. v. Magazines.com Inc.*, Civ. No. 00-2135, 2001 WL 8858, at *4 (E.D. Pa. Jan 4. 2001) (citation omitted).

In this Court's estimation, the factual context of this case indicates that California has the greatest interest in the application of its laws to the dispute between Panthera and KRL. Panthera's principal place of business is in California. (Docket No. 30, at ¶ 1). Thus, it suffered its injury there. While it appears that the place where the conduct causing the injury occurred might have been Wisconsin, where KRL was formed and is based, *id.* at ¶ 4, this contact is comparatively weaker. *See CAT Internet Servs.*, 2001 WL 8858, at *4. As to the place where the relationship between the parties is centered, the Court cannot ascertain said locus given the allegations as pled at this stage. Both Panthera and KRL appear to conduct business across the country, and the heavy rail cars that are the subject of this suit are presumably mobile. That Panthera decided to reach outside of California and enter into a contract with the Kasgro Entities further muddies the inquiry in light of the alter ego claims. Nevertheless, these facts do not change the Court's conclusion that the § 145(2) contacts as a whole weigh in favor of the application of California law. Therefore, the Court will apply the California UCL to the facts of this case.

### 5. Choice of Law Conclusion

To recapitulate, Pennsylvania's internal affairs doctrine mandates the application of

Wisconsin corporate law to Panthera's alter ego theory of liability against KRL. As to the substantive tort claims, the Court finds that there is no conflict as to California, Pennsylvania, and Wisconsin law on fraud and aiding and abetting fraud. Consequently, the Court is able to apply the laws of these states interchangeably as to these two claims. There is, however, a true conflict with respect to the unfair competition claim, and California has a superior interest in the application of its laws to this dispute. In light of these holdings, the Court applies California law to the unfair competition claim, which is therefore governed by the California UCL. For the sake of consistency, the Court also applies California law to Panthera's claims for fraud as well as aiding and abetting fraud against KRL.

## B. The Sufficiency of the Pleadings

The Court is troubled by the barebones, conclusory allegations contained in the Amended Complaint, especially in light of Rule 9(b) of the Federal Rule of Civil Procedure's mandate to "state with particularity the circumstances constituting fraud." Consistent with the following analysis, Panthera must file a Second Amended Complaint to remedy these defective pleadings as to the claims and theories asserted against KRL.

### 1. Pleadings as to the Alter Ego Theory of Liability

Panthera's claim of fraud against KRL depends on the viability of its alter ego theory.[16] In order to establish that KRL is liable for misrepresentations or other fraudulent activity of the Kasgro Entities pursuant to an alter ego theory, Wisconsin law requires Plaintiff to prove three elements:

---

[16] Wisconsin law permits the alter ego doctrine to be used to reach the assets of either the investor entity or the controlled corporate entity. *See Olen v. Phelps*, 546 N.W.2d 176, 181 (Wis. Ct. App. 1996) (alter ego theory can be used to "reach the assets of the controlling party" or "applied in reverse to reach the assets of a controlled entity"). Reverse alter ego liability is appropriate "'when the controlling party uses the controlled entity to hide assets or secretly to conduct business to avoid the pre-existing liability of the controlling party.'" *Id.* (quoting *Select Creations, Inc. v. Paliafito Am., Inc.*, 852 F. Supp. 740, 773 (E.D. Wis. 1994)). Here, Panthera is attempting to hold the subsidiary KRL liable for the actions of its alleged parent corporations, i.e., the other named Defendants. It is therefore invoking a reverse alter ego theory.

(1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

(2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights; and

(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Consumer's Co-op of Walworth Cnty. v. Olsen*, 419 N.W.2d 211, 217-18 (Wis. 1988). In addition, Wisconsin law recognizes a two-prong variant requiring: "(1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual [shareholders] no longer exist; and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow." *Id.* at n.5. Both tests essentially contain a "formalities requirement" and a "fairness requirement." *Id.*

These requirements have not been completely satisfied by the pleadings in the Amended Complaint, even upon review of the Amended Complaint and the accompanying attachments and drawing all reasonable inferences therefrom in favor of Panthera. *See Iqbal*, 556 U.S. at 678. With respect to the formalities requirement, Panthera must show that KRL "'has no separate existence of its own and is the mere instrumentality of the shareholders.'" *Capsavage v. Esser*, 591 N.W.2d 888, 890 (Wis. Ct. App. 1999) (citing *Consumer's Co-op*, 419 N.W.2d at 476). To that end, it has alleged that: (1) Schedule A to the InvestorsBank Security Agreement documents that "[KRL] is a subsidiary of Kasgro Rail," (Docket No. 30, at ¶ 77); (2) Mr. Silseth, the Treasurer of Kasgro Rail Corporation and President of Antietam LLC, the parent company of the Kasgro Entities, is also the registered service agent for KRL, *id.* at ¶¶ 35, 77; (3) numerous

members of KRL are also members of the Kasgro Entities; and (4) although KRL received $1.41 million in financing provided from InvestorsBank for assignment of the Westinghouse Lease by the Kasgro Entities, proceeds from this transaction were not received by the Kasgro Entities for distribution to their lessors as required by the 2005 Revised Lease. *Id.* at ¶¶ 35, 78-79.

These pleadings are insufficient as to the formalities requirement. First, Schedule A to the InvestorsBank Security Agreement describes KRL as an "assignee of Kasgro Rail Corporation and [KRCM], a division of Kasgro Rail Corporation." (Docket No. 30-6, at 27). This clause is ambiguous as to whether KRL or KRCM is a division of Kasgro Rail Corporation. To the extent that additional corporate records documenting KRL's ownership and control by the Kasgro Entities exist, such information must be included in the Second Amended Complaint.[17] Second, Mr. Silseth's status as KRL's registered service agent does not alone suffice to establish that he and the other corporations to which he is affiliated are controlling KRL. As KRL's counsel aptly pointed out at the oral argument, a registered service agent is not necessarily involved in running the corporation.[18] (Docket No. 97, at 47). Similarly, the fact that KRL and the Kasgro Entities share corporate officers does not necessarily entail that all the named Defendants have lost their corporate separateness. *See Conservatorship of Prom v. Sumitomo Rubber Indus, Ltd.*, 592 N.W.2d 657, 665 (Wis. Ct. App. 1999) (declined to disregard the separate corporate identity of a subsidiary that was wholly owned by a parent corporation and shared common directors with

---

[17] Pursuant to Rule 11 of the Federal Rules of Civil Procedure, counsel have a duty to investigate and research in preparing the pleadings prior to the submission of any written filing. *See, e.g., Bragdate Assocs., Inc. v. Fellows, Read & Assocs., Inc.*, 999 F.2d 745, 752 (3d Cir. 1993); *Carlino v. Gloucester City High Sch.*, 57 F. Supp. 2d 1, 36-37 (D.N.J. 1999); *Terminix Int'l Co., L.P. v. Kay*, 150 F.R.D. 532, 538 (E.D. Pa. 1993). The Court notes that Wisconsin's Department of Financial Institutions maintains a website wherein KRL's corporate information can be researched. WISCONSIN DEPARTMENT OF FINANCIAL INSTITUTIONS, http://www.wdfi.org/corporations/crispix/ (last visited August 21, 2013).

[18] A "registered agent" is a "person authorized to accept service of process for another person." BLACK'S LAW DICTIONARY 70 (8th ed. 2004). Under Wisconsin law, a "natural person who resides in [Wisconsin] and whose business office is identical with the registered office" is permitted to serve as a "registered agent" for a corporation. WIS. STAT. § 180.0501(1). As such, the registered agent need not have any role in managing the affairs of the corporation.

said parent) (citing *Cemetery Services, Inc. v. Wisconsin Dep't of Regulation and Licensing*, 586 N.W.2d 191, 827 (Wis. Ct. App. 1998)). In order to ensure compliance with Rule 9(b) of the Federal Rule of Civil Procedure's pleading requirements for fraud claims, Panthera must include in its next amended complaint all known facts about Mr. Silseth, Antietam LLC, their potential control over the Kasgro Entities, and, in turn, the Kasgro Entities' potential control over KRL.

Moreover, Panthera has not pled facts regarding KRL's "failure to observe corporate formalities, non-payment of dividends, siphoning of funds of the corporation by the dominant stockholder, non-functioning of other officers or directors, and the absence of corporate records." *Olen v. Phelps*, 546 N.W.2d 176, 181 (Wis. Ct. App. 1996) (citing *United States v. Pisani*, 646 F.2d 83, 88 (3d Cir. 1981)); *see also Cemetery Services, Inc.*, 586 N.W.2d at 827 (listing additional factors for determining whether plaintiff has met the formalities requirement). Revelation of facts regarding any one of these factors would help in ensuring compliance with Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. Given that the Wisconsin Supreme Court has emphasized that the corporate form "should not be lightly disregarded," *Rasmussen v. General Motors Corp.*, 803 N.W.2d 623, 631 (Wis. 2011), the Court finds that Panthera's allegations as to the formalities requirement, in their current form, do not support a plausible inference that KRL was "really one and the same—that the corporation is just a shell." *Rohrer v. Willis*, No. 02-1713, 2003 WL 147557, at *2 (Wis. Ct. App. Jan. 22, 2003). Therefore, the Court grants KRL's motion to dismiss for failure to state sufficient facts to support an alter ego theory of liability, without prejudice to Plaintiff filing a Second Amended Complaint.[19]

---

[19] The Court, however, notes that Panthera has adequately pled sufficient facts to satisfy the alter ego fairness requirement for purposes of the Rule 12(b)(6) motion to dismiss. *See Rasmussen*, 803 N.W.2d at 631 (fairness requirement satisfied if maintaining corporate separateness would "accomplish some fraudulent purpose, operate as a constructive fraud, or defeat some strong equitable claim") (quoting *Consumer's Co-op.*, 419 N.W.2d 211). KRL was allegedly established for the purpose of hiding transactions and profits from the lessors of the Kasgro Entities, as demonstrated by the fact that Panthera was neither alerted nor received profits from the assignment of the Westinghouse Lease and at least one other leasing deal. (Docket No. 30, at ¶¶ 79, 82). Insofar as

(Docket No. 98).

## 2. Pleadings as to Fraud

The Amended Complaint does not contain allegations that KRL directly made any misrepresentations to Panthera. Rather, Panthera claims that the Kasgro Entities used KRL to conceal unreported rail car leases. (Docket No. 30, at ¶ 150). Under California law, a claim of fraud may involve a concealment or nondisclosure. *OCM Principal Opportunities Fund v. CIBC World Mkts. Corp.*, 68 Cal. Rptr. 3d 828, 840 (Cal. Ct. App. 2007); *see also Lovejoy v. AT&T Corp.*, 111 Cal. Rptr. 2d 711, 719 (Cal. Ct. App. 2001) ("The principle is fundamental that '[deceit] may be negative as well as affirmative; it may consist of suppression of that which it is one's duty to declare as well as of the declaration of that which is false."). The elements of fraudulent concealment are: "(1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." *Lovejoy*, 111 Cal. Rptr. 2d at 719 (quoting *Marketing West, Inc. v. Sanyo Fisher (USA) Corp.*, 7 Cal. Rptr. 2d 859, 864 (Cal. Ct. App. 1992)).

Given the Court's prior discussion regarding the alter ego theory of liability, the Court finds that Panthera has failed to allege sufficient facts to establish that KRL was under a duty to

KRL is now allegedly in possession of profits that belong to lessors of the Kasgro Entities, such as Panthera, the failure to pierce the corporate veil would permit Defendants to "evade an obligation, to gain an unjust advantage or to commit an injustice." *Capsavage*, 591 N.W.2d at 890 (quoting *Consumer's Co-op.*, 419 N.W.2d 211); *see also* Richard Squire, *Strategic Liability in the Corporate Group*, 78 U. Chi. L. Rev. 605, 612 (2011) (describing the corporate "shell game" of shifting assets among interrelated corporations for the purpose of evading creditors). While the pleadings as to the fairness requirement are sufficient to surmount the Rule 12(b)(6) pleading standard, additional discovery will be needed to support whether KRL was actually established for a fraudulent purpose at the summary judgment stage, if this case does not resolve short of same.

disclose the Westinghouse Lease transaction. Although the Kasgro Acknowledgement can be read to imply that the Kasgro Entities had a duty to reveal such information, KRL has repeatedly insisted that it is not subject to the 2005 Revised Lease and had nothing to do with any misrepresentations made by the Kasgro Entities through said Acknowledgement. (Docket No. 38, at 14-15; Docket No. 46, at 10-12; Docket No. 90, at 7; Docket No. 97, at 4-7, 12-13, 45). In addition, Panthera's counsel conceded during the oral argument that there may be additional, more specific facts that could be pled with respect to Mr. Crawford and Mr. Plut's role in any alleged fraudulent scheme. (Docket No. 102, at 6). This is not the time for keeping facts in reserve. The Court expressed its disappointment to counsel about the existence of facts in the briefing that were not pled in the Amended Complaint. *Id.* at 16. In order to fully effectuate the purposes of notice pleading, all known facts demonstrating wrongdoing should be set out in the pleadings. *See Seeds of Peace Collective v. City of Pittsburgh*, 453 F. App'x 211, 215 (3d Cir. 2011) (refusing to consider facts alleged in a brief but not pled in the complaint) (citing *Kost v. Kozakiewicz*, 1 F.3d 176, 183 n.4 (3d Cir. 1993) and *Williams v. New Castle Cnty.*, 970 F.2d 1260, 1266 n.4 (3d Cir. 1992)). Hence, Panthera is permitted to again amend its complaint and discovery will follow. (Docket No. 98).

### 3. Pleadings as to Aiding and Abetting Fraud

Pursuant to California law, liability may be imposed "on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person." *Saunders v. Superior Court*, 33 Cal.Rptr.2d 438, 446 (Cal. Ct. App. 1994) (citing RESTATEMENT (SECOND)

OF TORTS § 876); *see also Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1118 (C.D. Cal. 2003). As the Court noted at the oral argument, however, the phrase "substantial assistance" has been used in a conclusory manner in the Amended Complaint without a satisfactory quantum of factual support. (Docket No. 102, at 7). In response, Panthera argued that the tort claims against KRL are based on a continuous fraud in which it was a willing and crucial partner. (Docket No. 43, at 16; Docket No. 102, at 5). Yet, the only facts that can be construed to suggest improper behavior by KRL relate to the Westinghouse Lease and one other unspecified leasing deal. (Docket No. 30, at ¶¶ 79, 82). All the other averments of wrongdoing pled in the Amended Complaint solely involve the Kasgro Entities. *Id.* at ¶¶ 67-73, 89-101. To the extent that Panthera is aware of additional incidents capable of supporting a plausible inference of a continuous fraud, these incidents of misconduct must be detailed in the Second Amended Complaint. For these reasons, the Court grants KRL's motion to dismiss as to the aiding and abetting fraud claim but permits Panthera to file another amended complaint.[20] (Docket No. 98).

### 4. Pleadings as to the California UCL

As the Court already elaborated, § 17200 "'borrows' violations of other laws and makes them independently actionable as unfair competitive business practices." *Lauter*, 642 F. Supp. 2d at 1096. To that end, the Amended Complaint charges KRL with violating the California UCL for "committing the tortious conduct identified in this Complaint." (Docket No. 30, at ¶ 172). Because the other tort claims against KRL have been inadequately pled, the Court finds that a

---

[20] The Court is also mindful that "California courts have long held that liability for aiding and abetting depends on proof the defendant had actual knowledge of the specific primary wrong the defendant substantially assisted." *Casey v. U.S. Bank Nat'l Ass'n*, 26 Cal.Rptr.3d 401, 406 (Cal. Ct. App. 2005). A defendant who aids and abets a tort must know about the tortious plan and acted with the intent of facilitating that tort. *See id.* at 407 ("A defendant can be held liable as a cotortfeasor on the basis of acting in concert only if he or she knew that a tort had been, or was to be, committed, and acted with the intent of facilitating the commission of that tort."). While Rule 9(b) of the Federal Rules of Civil Procedure permits intent and knowledge to be alleged generally, the Court reminds Panthera that it must produce sufficient evidence supporting such allegations to put an issue in dispute in order to surmount summary judgment. FED. R. CIV. P. 56(c)(1).

violation of the California UCL cannot be advanced unless and until those pleading defects are resolved by way of a Second Amended Complaint, upon which this case may proceed. (Docket No. 98).

**IV.    Conclusion**

Based on the foregoing, KRL's motion to dismiss [37] is GRANTED, without prejudice. Consistent with the Court's Order on the record at the conclusion of the oral argument conducted on August 5, 2013, (Docket No. 98), and the Text Order dated August 16, 2013, Panthera is to submit a Second Amended Complaint that addresses the Court's concerns about the sufficiency of the pleadings raised in oral argument and outlined in this Opinion by **_August 26, 2013_**, under the applicable law as set forth herein.

_s/ Nora Barry Fischer_
Nora Barry Fischer
United States District Judge

Date:   August 21, 2013
cc/ecf:  All counsel of record